1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MINDY BARLOW and DALIA R. SMITH, | CASE NO. 07cv1926-LAB (LSP) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| vs. | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO; MICHAEL RODDY, individually and in his official capacity as the Executive Officer of the Superior Court of California, County of San Diego; and DOES 1 through 20, inclusive, | [Dkt No. 13] |
| Defendants. | |

This 42 U.S.C. § 1983 civil rights action is before the Court on defendants' FED.R.CIV.P. ("Rule") 12(b)(6) Motion To Dismiss the First Amended Complaint ("FAC") for failure to state a claim upon which relief can be granted ("Motion"). The FAC alleges eight causes of action asserting constitutional violations arising from the denial of certain Superior Court employees' request to use court facilities for weekly Bible study meetings. Plaintiffs name as defendants the San Diego County Superior Court and the Executive Officer of that court. They seek injunctive relief, declaratory relief, and nominal damages. Plaintiffs filed an Opposition to the Motion, and defendants filed a Reply. Pursuant to Civ. L. R. 7.1(d)(1), the Court finds the issues presented appropriate for decision on the papers and without oral argument. For the reasons discussed below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

1    I.    **BACKGROUND**

2           Mindy Barlow ("Barlow") and Dalia R. Smith (collectively "Plaintiffs") are two court

3    reporter employees of the San Diego County Superior Court.  They have sued the Superior

4    Court and Michael Roddy, individually and in his official capacity as the Executive Officer of

5    the San Diego County Superior Court (collectively "Defendants"), alleging violations of their

6    rights under the First and Fourteenth Amendments to the United States Constitution and

7    under the California Constitution, Article I, §§ 2, 4, and 7, associated with Defendants' denial

8    of permission for Plaintiffs and others to assemble inside the courthouse at lunchtime to hold

9    weekly Bible study.  In particular, Plaintiffs invoke their free speech, free exercise, equal

10   protection, and due process rights, as well as alleging Defendants' conduct violates the

11   Establishment Clause for purportedly preferring nonreligion to religion.

12          The FAC alleges defendant Roddy's predecessor gave permission to a Superior Court

13   judge's clerk sometime during the year 2000 to hold Bible study over the lunch hour in an

14   available jury room.  Plaintiffs were among about twelve court employees who, "of their own

15   volition and without solicitation or advertisement," regularly attended the weekly Bible study

16   between 2000 and April 2006.  FAC ¶¶ 10-13.  Plaintiffs describe the meetings as providing

17   "valuable encouragement and spiritual fulfillment to its participants," who believe "gathering

18   together for discussion, Bible study, worship, and fellowship is an important component to

19   their religious beliefs and is a biblical mandate."  Participants discussed "healthy living,

20   lifestyle choices, and physical, mental, and spiritual health from a biblical perspective." FAC

21   ¶¶ 28-30.

22          In April 2006, a Deputy Sheriff informed Barlow that individuals without keycard

23   access were not allowed entrance to the back hallways, where the jury rooms are located.

24   Members of the Bible study asked about the use of a courtroom instead for their meetings.

25   Court administrators informed them court policy did not allow Bible studies in courthouse

26   facilities because of a concern regarding the "separation of church and state."  The Bible

27   study group has not reconvened inside the courthouse since then.  FAC ¶¶ 12-13.  In

28   May 2006, Barlow received an e-mail from the court's then-Assistant Executive Officer, Ray

Sorenson, confirming Bible study meetings in any courtroom were contrary to court policy. Barlow searched the court's Personnel Rules, but found no policy prohibiting the Bible study group from meeting on court premises.  FAC ¶¶ 14-15.  On June 2, 2006, Mr. Sorenson informed Barlow the Superior Court Administration was looking into the issue, and on September 29, 2006, he informed her the court was in the process of writing a policy that would cover the issue of "nonbusiness use" of court facilities.  FAC ¶¶ 16-17.

On November 13, 2006, the court adopted Administrative Policy ("AP") 4.6, Use Of Court Facilities, attached as Exhibit "A" to the FAC.  FAC ¶¶ 17-18.  The provisions of AP 4.6.II.B permit court employees to use "court facilities" (described as including "any open room, chambers, or area within a building in which court business is conducted") for celebrations of "personal milestones commonly celebrated in the workplace such as birthday parties, baby or wedding showers, and retirement celebrations, as long as the event does not interfere with the business of the court."  FAC ¶¶ 19-20, Exh. "A".  Plaintiffs' requested non-business use of court premises does not fall into the category of "personal milestone" celebrations and thus is not covered by AP 4.6.II.B.  The written policy also formalized in a subsequent section a reservation process applicable to **all requests** by employees, the public, or any other person or entity, to use a "court facility" for **any other purpose**:

> C.  Requests to Use Court Facilities.
>
> 1. All requests ***by employees*** for events other than those addressed in paragraph B above, ***and* all requests by government or outside agencies, or by the public** to use courthouse meeting rooms, unassigned courtrooms, offices or other public or non-public areas of any court facility, must be **submitted in writing**.  The request must **include a description of the program or service**, and must be submitted preferably 30 days in advance of the desired date of use to the Assistant Executive Officer of the division in which the facility is located, who will **evaluate the request using all of the following factors**:
>
> > a.  Protection of the integrity of the judicial process, including public trust and confidence in the impartiality, lack of bias or discrimination, and fairness of the judicial system;
> >
> > b.  Safety and security of the people and property within the courthouse and its perimeter;

c.  Whether the program or service advances the administration of justice and is useful to a significant number of **litigants**;

d.  Whether the program imposes any potential costs or liability on the court;

e.  Whether the program or service is conducted for profit; and

f.  Whether constitutional, statutory, or other legal requirements prohibit the court from granting use of its facilities.

FAC ¶¶ 20-21, Exh. "A", AP 4.6.II.C (emphasis added).

In mid-November 2006, pursuant to that policy, Barlow submitted a written request to hold Bible study meetings during her lunch hour in an open jury room.  FAC ¶ 23.  On January 25, 2007, the then-new (and now former) Assistant Executive Officer, Stephen Cascioppo, met with Barlow to tell her the request was denied on the basis of separation of church and state and pursuant to AP 4.6.II.C.1(f).  Mr. Cascioppo's oral notification was followed by a February 1, 2007 written denial letter referencing the policy.[1]  FAC ¶¶ 23-25, Exh. "B."  By letter dated February 26, 2007, Barlow asked Mr. Cascioppo to reconsider the administration's position "and allow our Bible Study to meet once again."  FAC Exh. "C."  She also informed him the group had contacted the American Center for Law and Justice (ACLJ), an organization she represents "has been established to protect religious and constitutional rights," and the ACLJ told them "our Bible Study is protected by the First Amendment and that, under that protection, our group has the right to meet on court grounds during our lunch hour."  FAC ¶ 26, Exh. "C."  The letter references an enclosed "article taken from the ACLJ's website regarding a Bible Study being held in a St. Charles County, Missouri, courthouse we believe is exactly on point with our situation here in our San Diego County courthouse."  Barlow's letter referred to "excerpts from the ACLJ's letter" that allegedly "address the grounds for our Administration's denial of our request."  FAC Exh. "C."

---

[1]  Cascioppo's letter "Re: Use of Jury Room," is addressed to Barlow, and provides in its entirety: "As discussed at our meeting on Thursday, January 25, 2007, your request to use the San Diego Superior Court jury room for a non-court related matter has been denied pursuant to San Diego Superior Court Administrative Policy Section 4.6."  The letter indicates copies went to "Mike Roddy, Executive Officer" and "Darlene Dornan, Dir. Legal Services."  FAC Exh. "B."

07cv1926

The referenced article is not attached to the FAC letter exhibit.  Barlow asked that the court's local legal department review the article to educate the court administration and "to alleviate any constitutional concerns it may have."  FAC Exh. "C."

In a letter dated March 14, 2007, Mr. Cascioppo acknowledged receipt of Barlow's letter and the "two articles" she enclosed.  FAC Exh. "D." He stated he read the articles "with interest, however it has not changed my conclusion that **allowing religious use of court premises** is not in the best interests of the San Diego Superior Court under the criteria of its Administrative Policy, Use of Court Facilities, 4.6.II.C.1."  FAC Exh. "D" (emphasis added).  He characterized the courthouse as not public premises, and explained in terms tracking certain factors enumerated in the policy:

> **First**, the premises of the court are not public, and the court does not wish to open them up generally to public activities. This would be required in order to ensure public trust and confidence in the impartiality, lack of bias or discrimination and fairness of the judicial system. **Second**, the proposed use does not advance the administration of justice, and is not useful to a significant number of litigants.   The premises are better preserved for the uses for which the property has been lawfully dedicated.  **Finally**, the request may impose high potential costs or liability on the court.  I trust you can appreciate my desire to avoid embroiling the court in potentially expensive and protracted litigation.

FAC Exh. "D" (emphasis added).

The FAC alleges "during the time relevant to this action," Defendants have allowed in court facilities:   weekly meetings of Weight Watchers, characterized as "a public organization" which "does not advance the administration of justice;" occasional meetings of the Boy Scouts of America, characterized as "both a public organization and does not advance the administration of justice;" "other organizations to meet or hold non-court related events;" and "members of the public, as well as employees, to participate and hold [unspecified] events."  FAC ¶¶ 31-34.  The FAC does not allege any faith-based meetings, other than Plaintiffs', have been approved or disapproved under AP 4.6.[2]

---

[2]   Defendants argue: "Indeed, Plaintiffs expressly allege that their use of the Superior Court jury room was initially discontinued because a Deputy Sheriff informed Plaintiff Barlow that individuals without keycard access were not allowed entrance to the Superior Court's back hallways. *See* FAC ¶ 12.  That is, Plaintiffs admit their use was initially discontinued by law enforcement personnel on

1    An "Allegations of Law" section in the FAC contends Defendants' conduct is causing

2  Plaintiffs "irreparable harm to their federal and state constitutional rights" until "enforcement

3  of the administrative policy is enjoined."  FAC ¶¶ 35-37.  Plaintiffs assert eight causes of

4  action predicated on denial of their request to hold Bible study in the courthouse, the first five

5  under the federal Constitution's First and Fourteenth Amendments and the last three under

6  the California State Constitution, Article 1, §§ 2. 4. and 7, respectively:  **First**, violation of

7  First Amendment free speech rights; **Second**, violation of the First Amendment free exercise

8  clause; **Third**, violation of the Fourteenth Amendment equal protection clause; **Fourth**,

9  violation of the Fourteenth Amendment due process clause; **Fifth**, violation of the First

10  Amendment establishment clause; **Sixth**, violation of freedom of speech; **Seventh**, violation

11  of the right to free exercise of religion; and **Eighth**, violation of the rights of due process of

12  law and equal protection.  FAC pp. 7-13.

13    Plaintiffs seek an Order:  permanently enjoining enforcement of AP 4.6 "to the extent

14  that it discriminates on the religious content or viewpoint of speech," and "to the extent that

15  it prohibits Plaintiffs from using the jury room for a Bible study;" entering a declaratory

16  judgment "that AP 4.6 is facially unconstitutional and violates Plaintiffs'" constitutional rights

17  or, if AP 4.6 is not found to be facially unconstitutional, a declaratory judgment "stating that

18  AP 4.6, as applied to Plaintiffs, is unconstitutional and violates" their constitutional rights; and

19  awarding nominal damages and costs and expenses of suit, including attorneys' fees

20  pursuant to 42 U.S.C. § 1988 and Cal. Code Civ. P. § 1021.5.  FAC pp. 13-14.

21    Defendants move to dismiss the action in its entirety alleging failure to state a claim

22  on which relief can be granted under any of Plaintiffs' theories, and advancing among other

23  things an Establishment Clause defense.

24  ────────────────

25  purely administrative and security grounds having nothing to do with speech or religion."  Mot. p. 9,
   n.3.  The Court does not rely for purposes of deciding this Motion on the historical (i.e., 2002 to 2006)

26  permissive use as the relevant time frame for the forum characterization analysis, but rather looks
   to the current posture of the dispute and permissive uses of the court facilities associated with the

27  written policy and communications while the administration was formulating the restrictive use policy.
   The FAC targets the constitutionality of the policy (formalized in November 2006) and its application.

28  Prior permissive use can be withdrawn if it is determined the designated or limited uses associated
   with a particular forum are not sufficiently broad to encompass the previously permitted use.  *See*
   Berry v. Dep't of Soc. Servs, 447 F.3d 642, 653 (9th Cir. 2006).

07cv1926

1  **II.    DISCUSSION**

2  **A.    Legal Standards**

3      A Rule12(b)(6) motion to dismiss tests the sufficiency of the complaint.  Navarro v.

4  Block, 250 F.3d 729, 732 (9th Cir. 2001).  Rule 8(a)(2) requires only "a short and plain

5  statement of the claim showing that the pleader is entitled to relief," in order to "give the

6  defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell

7  Atlantic Corp. v. Twombly, -- U.S. --, 127 S.Ct. 1955, 1964 (May 21, 2007), *quoting* Conley

8  v. Gibson, 355 U.S. 41, 47 (1957).  "While a complaint attacked by a Rule 12(b)(6) motion

9  to dismiss does not need detailed factual allegations," the grounds to support entitlement to

10  relief "must be enough to raise a right to relief above the speculative level." Bell Atlantic, 127

11  S.Ct. at 1964-66 (citations omitted), *abrogating the formulation in* Conley, 355 U.S. at 45-46.[3]

12  Dismissal under Rule 12(b)(6) does not require appearance, beyond a doubt, that plaintiff

13  can prove *no* set of facts in support of a claim, but "when the allegations in a

14  complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency

15  should . . . be exposed at the point of minimum expenditure of time and money by the parties

16  and the court.' "  Id. (citations omitted).

17      Thus, a complaint may be dismissed where it presents a cognizable legal theory, but

18  fails to plead essential facts under that theory.  Robertson v. Dean Witter Reynolds, Inc.,749

19  F.2d 530, 534 (9th Cir. 1984); *see* Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th

20  Cir. 1988).  Dismissal is also warranted where the complaint lacks a cognizable legal theory.

21  Robertson,749 F.2d at 534; *see* Neitzke v. Williams, 490 U.S. 319, 326 (1989) ("Rule

22  12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law").  In

23  determining whether the complaint states a claim, the court must assume the truth of all

24  factual allegations and must construe them in the light most favorable to the nonmoving

25

26      [3]    Conley's "no set of facts" language "has earned its retirement. The phrase is best
    forgotten as an incomplete, negative gloss on an accepted pleading standard:  once a claim has
27  been stated adequately, it may be supported by showing any set of facts consistent with the
    allegations in the complaint." Bell Atlantic, 127 S.Ct. at 1969.  "It is not . . . proper to assume that
28  [the plaintiff] can prove facts that it has not alleged or that the defendants have violated the [laws]
    in ways that have not been alleged."  Id. at 1969 n.8 (citation omitted).

party, including all reasonable inferences to be drawn from the facts alleged. <u>Cahill v. Liberty Mut. Ins. Co.</u>, 80 F.3d 336, 337-38 (9th Cir. 1996); <u>Cedars-Sinai Medical Center v. National League of Postmasters of U.S.</u>, 497 F.3d 972, 975 (9th Cir. 2007).   However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations.    <u>Roberts v. Corrothers</u>, 812 F.2d 1173, 1177 (9th Cir. 1987); *see also* <u>Transphase Systems, Inc. v. Southern California Edison Co.</u>, 839 F.Supp. 711, 718 (C.D. Cal. 1993) (the court does not "need to accept as true conclusory allegations . . . or unreasonable inference") (citation omitted); *see also* <u>Warren v. Fox Family Worldwide, Inc.</u>, 328 F.3d 1136, 1139 (9th Cir. 2003).

"Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint." <u>Marder v. Lopez</u>, 450 F.3d 445, 448 (9th Cir. 2006), *citing* <u>Warren</u>, 328 F.3d at 1141 n. 5.   Nevertheless, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." <u>Id.</u>, *citing* <u>Branch v. Tunnell</u>, 14 F.3d 449, 453-54 (9th Cir.1994), *overruled on other grounds by* <u>Galbraith v. County of Santa Clara</u>, 307 F.3d 1119 (9th Cir.2002); *see also* <u>Warren</u>, 328 F.3d at 1141 n. 5.   "The court may treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).' " <u>Id.</u>, *quoting* <u>United States v. Ritchie</u>, 342 F.3d 903, 908 (9th Cir.2003).   When a Rule 12(b)(6) motion is granted, leave to amend is ordinarily denied only when it is clear that the deficiencies cannot be cured by amendment. <u>DeSoto v. Yellow Freight Sys., Inc.</u>, 957 F.2d 655, 658 (9th Cir. 1992).

**B.     First Amendment Standard:   Government Employee Or Forum Analysis**

In support of their Motion, Defendants identify two possible analytical approaches to determine whether the FAC states a claim predicated on First Amendment violations.   First, they contend dismissal is warranted under the balancing test of <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968), applicable in the context of a government employer's regulation of its employees' speech.   Alternatively, if the Court rejects the <u>Pickering</u> test in these

1   circumstances, they contend dismissal is also warranted applying traditional "forum analysis"

2   legal standards.  Mot. 11:5-8.

3          Defendants argue "[t]his case involves a government employer's regulation of its own

4   employees' speech in the workplace, a non-public forum," so the "Pickering balancing test

5   applies."  Reply 1:9-12; Mot. 4:26-5:1 ("In the government employee context, the Pickering

6   balancing test supplants the traditional 'forum analysis' approach to free speech issues").

7   Government entities are afforded wider latitude in regulating the speech of their employees

8   than the speech of the public at large, with such restrictions subject to less strict judicial

9   scrutiny.

10          In Pickering, the Supreme Court considered a First Amendment challenge by a

11   teacher dismissed from his public school employment after he sent a letter to a local news

12   outlet critical of proposals to raise new tax revenues for the schools.  The Court held the

13   teacher's exercise of his right to speak on issues of public importance may not furnish a

14   basis to terminate his employment because statements by public officials on matters of

15   public concern must be accorded First Amendment protections, even if they are critical and

16   directed at their employer.  Pickering, 391 U.S. at 574.  The speech at issue did not impede

17   the teacher's proper performance of his daily classroom duties or interfere with the regular

18   operation of the schools generally.  The Court found the school administration's interest was,

19   therefore, not significantly greater than its interest in limiting similar comments by any

20   member of the general public, and consequently the teacher could not constitutionally be

21   dismissed from his position on that basis.  Pickering, 391 U.S. at 572-73, 567-68, 574.

22                  At the same time it cannot be gainsaid that the State has
        interests as an employer in regulating the speech of its
23              employees that differ significantly from those it possess in
        connection with regulation of the speech of the citizenry in
24              general.  The problem in any case is to arrive at a **balance
        between the interests of the [employee], as a citizen, in
25              commenting upon matters of public concern and the
        interest of the State, as an employer, in promoting the
26              efficiency of the public services it performs through its
        employees**.

27
     Pickering, 391 U.S. at 568 (emphasis added); *see also* City of San Diego v. Roe, 543 U.S.
28
     77, 82 (2004) (reaffirming the use of the Pickering balancing test to "reconcile the

- 9 -                                                        07cv1926

1   employee's right to engage in speech and the government employer's right to protect its own

2   legitimate interests in performing its mission").

3        The <u>Pickering</u> doctrine establishes employees cannot be forced to relinquish their

4   First Amendment rights simply because they have the benefit of public employment, but the

5   public employer can regulate workplace speech if it justifies its action and its interests

6   outweigh those of the employee.  *See* <u>Tucker v. State of Cal. Dept. of Educ.</u>, 97 F.3d 1204,

7   1210 (9th Cir. 1996).  In <u>Tucker</u>, a state agency employee brought an action against his

8   employer alleging violation of his First Amendment rights on grounds his employer's orders

9   banned *all* speech in the nature of religious advocacy, oral or written, in the workplace, with

10  agency clients or others, and banned display of religious materials outside employees'

11  cubicles or offices.  That court found: "Although the government may have legitimate

12  interests in preventing a number of the activities in which Tucker has engaged or wants to

13  continue to engage, the challenged orders are overbroad and impermissibly infringe on First

14  Amendment rights," reversing the district court's grant of summary judgment for the

15  government and directing entry of summary judgment in favor of plaintiff.[4]  <u>Id.</u> at 1208.

16       The <u>Tucker</u> court's first step was "to separate the doctrines that are applicable here

17  from those that are not."  <u>Tucker</u>, 97 F.3d at 1209.  The plaintiff in <u>Tucker</u> contended the

18  government employer "had created a limited purpose public forum in its offices by allowing

19  its employees both to discuss 'public questions when they assemble informally at their desks,

20  drinking fountains, lunch rooms, copy machines, etc.' and to display written materials in and

21  around their offices and cubicles."  <u>Tucker</u>, 97 F.3d at 1209.  "Assuming that Tucker and his

22  co-workers talked about whatever they wanted to at work (before the passage of the

23  challenged order), and that they posted all sorts of materials on the walls, that still would not

24

25       [4]   The orders at issue in <u>Tucker</u> prohibited employees from: storing or displaying "any
     religious artifacts, tracts, information or other materials in any part of the workplace other than their
26   own closed offices or defined cubicles;" engaging "in any religious advocacy, either written or oral,
     during work hours or in the workplace;" and placing personal symbols, logos, acronyms or titles
27   unrelated to the business of the agency on any official communications or work product.  <u>Tucker</u>, 97
     F.3d at 1208-09.  Prior to formalizing the policy applicable to all employees, Tucker's supervisors
28   told him to refrain from doing all those things, and, in addition, ordered him "to refrain from initiating
     or promoting religious discussions during the course of your work day.  Breaks and lunch periods are
     excluded, provided such prohibited activity takes place outside the work place."  <u>Id.</u> at 1208.

07cv1926

1   show that the government had intentionally opened up the workplace for public discourse."

2   Id.   The Tucker court rejected the employee's argument that strict scrutiny applied in

3   evaluating the employer's orders, relying on Cornelius v. NAACP Legal Defense Fund, 473

4   U.S. 788, 802 (1985) for the proposition "the government does not create a public forum by

5   inaction or by permitting limited discourse, but only by intentionally opening a nontraditional

6   forum for public discourse." Id.

7        The Tucker court also rejected the state's argument the restrictions should be

8   considered time, place, and manner restrictions because "the time, place and manner test

9   is only applicable to speech regulations that are content neutral." Tucker, 97 F.3d at 1209-

10  10.  Restrictions on expression are content neutral if they are "justified without reference to

11  the content of the regulated speech" Clark v. Community for Creative Non-Violence, 468

12  U.S. 288, 293 (1984). "Because the orders here regulate only a certain type of expression,

13  based on its *content* – religious expression – they are not content neutral" because the

14  employer "specifically target[ed] religious speech and no other." Tucker, 97 F.3d at 1209-10.

15  For that reason, the employer's orders failed both the content-neutral test and the Free

16  Exercise burden test of only "incidental" restriction on the employee's religious practice. Id.

17       The state also unsuccessfully argued the orders "serve[d] the state's compelling

18  interest in remaining neutral on religious matters and avoiding the establishment of religion."

19  Tucker. 979 F.3d at 1212.  In reliance on Widmer v. Vincent, 454 U.S. 263, 273 (1981)[5] and

20  Rosenberger v. University of Virginia, 515 U.S. 819 (1995),[6] the Tucker court observed there

21

22  [5]  In Widmer, the Supreme Court held a university, having created a forum generally open
    for use by student groups, was required to justify its discriminations and exclusions under applicable
23  constitutional norms.  The Court also held the challenged exclusionary policy was based on the
    content of the religious speech and therefore violated the fundamental principle state regulation of
24  speech must be content-neutral, concluding the state's interest in achieving greater separation of
    church and state than is already ensured by the Establishment Clause by itself was not sufficiently
25  compelling to justify discrimination against the plaintiff group.

26  [6]  In Rosenberger, the Court considered whether a University of Virginia policy to exclude
    religious publications from eligibility for student funds was viewpoint discrimination or permissible
27  content-based exclusion.  Rosenberger, 515 U.S. at 825.  The University had created the policy to
    avoid a possible Establishment Clause violation by excluding from its funding support student
28  publications that espoused and promoted religious beliefs, among other things.  A majority of the
    Court determined "the University [did] not exclude religion as a subject matter but select[ed] for
    disfavored treatment those student journalistic efforts with religious editorial viewpoints." Id.

1   must be "a 'plausible fear' that the speech in question would be attributed to the state" in

2   order to sustain an Establishment Clause argument.  Id.  If there is "no real likelihood" the

3   speech would  be perceived as "either endorsed or coerced by the State," the prohibited

4   conduct would not give the impression of carrying the "impermissible 'imprimatur of state

5   approval on religious sects or practices' " prohibited by the doctrine of separation of church

6   and state.  Id.

7          In the end, Tucker adopted the standard of review governing employee speech in the

8   workplace, rather than forum analysis.   Applying Pickering, Tucker held the state's

9   justifications and asserted interests did not outweigh the employees' expressive rights

10  because the banned expression did not have a "necessary [adverse] impact on the actual

11  operation of the Government."[7]  Tucker, 979 F.3d at 1214, quoting Pickering, 391 U.S. at

12  571.  "Although we recognize that the state has a legitimate interest in avoiding the

13  appearance of supporting religion and in furthering the efficiency of the workplace, the state

14  interests here are insufficient to support the ban on religious advocacy . . . ."  Id. at 1217,

15  1210 ("the speech is religious expression and it is obviously of public concern").[8]

16  ─────────────────────

17  Inasmuch as "other student publications were free to discuss the topic of religion from a myriad of
18  views other than the prohibited perspective, the University had discriminated on the basis of
    viewpoint."  Faith Center Church Evangelistic Ministries v. Glover, 462 F.3d 1194, 1208 (9th Cir.
19  2006), opinion amended and superseded on denial of rehearing, 480 F.3d 891 (9th Cir. 2007), cert.
    den., 128 S.Ct. 143 (U.S. Oct. 1. 2007), summarizing the holding in Rosenberger. See Lamb's
20  Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 393 (1993) (applying the
    Rosenberger test to unanimously hold denial of access to a school facility by a religious group
21  seeking to show a film series on child rearing from a Christian perspective because of the school
    district's policy barring use of the rooms for religious purposes "discriminate[d] on the basis of
22  viewpoint [by] permit[ting] school property to be used for the presentation of all views about family
    issues and child rearing except those dealing with the subject matter from a religious standpoint").

23      [7]   The Tucker court also found the order banning religious advocacy to be overbroad.
24  "Overbreadth challenges are a form of facial challenge that applies specifically to the First
    Amendment."  Tucker, 97 F.3d at 1217, n.10.  The court construed the order as applying at any time
25  in the workplace (prohibiting religious advocacy "during work hours or in the workplace") (emphasis
    added).  Id. n.11.  The overbreadth was "real and substantial" because the order "prevents free
26  expression by employees, whenever they are in the workplace, even during lunch breaks, coffee
    breaks, and after-hours."  Id. at 1217.  This case presents no such concern.

27      [8]   "This circuit and other courts have defined public concern speech broadly to include almost
28  any matter other than speech that relates to internal power struggles within the workplace." Tucker,
    97 F.3d at 1210), citing Gillette v. Delmore, 886 F.2d 1194, 1197 (9th Cir. 1989) ("Speech that can
    fairly be considered as relating to any matter of political, social, or other concern to the community

1        In reliance on <u>Berry v. Dep't of Soc. Servs</u>, 447 F.3d 642 (9th Cir. 2006), Plaintiffs

2   argue traditional forum analysis standards, rather than the <u>Pickering</u> balancing test, must be

3   applied to resolve the parties' dispute.  Opp. pp. 5-6.  In <u>Berry</u>, a Social Services employee

4   displayed religious items in his cubicle and discussed religion with the agency's clients.  Mr.

5   Berry also organized a monthly employee prayer meeting to take place in a particular

6   conference room in the agency's facility.  The prayer meetings were voluntary and were held

7   at lunch time.  <u>Berry</u>, 446 F.3d at 646.  The <u>Berry</u> court addressed several  free speech and

8   free exercise issues raised by the  public employer's restrictions, affirming a grant of

9   summary judgment to the employer and a denial of summary judgment for the employee.

10        <u>Berry</u> applied the <u>Pickering</u> balancing test to uphold the agency's rule forbidding

11   employees to discuss religion with clients:  "While it allowed employees to discuss religion

12   among themselves, it avoided the shoals of the Establishment Clause by forbidding them

13   from discussing religion with its clients." <u>Berry</u>, 447 F.3d at 657; <i>see</i> <u>Waters v. Churchill</u>, 511

14   U.S. 661, 668 (1994) (for a government employee's speech to be protected, "the speech

15   must be on a matter of public concern, and the employee's interest in expressing herself on

16   this matter must not be outweighed by any injury the speech could cause to 'the interest of

17   the State, as an employer, in promoting the efficiency of the  public services it performs

18   through its employees' ") (citations omitted).  <u>Berry</u> also applied the <u>Pickering</u> test to uphold

19   the agency's rule restricting employees from prominently displaying religious items:

20   "Similarly, the Department allowed employees to display religious items, except where their

21   viewing by the Department's clients might imply endorsement thus evading the reef of the

22   Establishment Clause." <u>Id.</u>  "[T]he <u>Pickering</u> balancing approach applies regardless of the

23   reason an employee believes his or her speech is constitutionally protected," whether as

24   commentary on matters of public concern or whether the employee asserts First Amendment

25   protections for religious speech.  <u>Berry</u>, 447 F.3d at 649-50.

26

27   is constitutionally protected").  "[A]n employee need not address the public at large, for his speech
28   to be deemed to be on a matter of public concern."  <u>Id.</u>, <i>citing</i> <u>Rankin v. McPherson</u>, 483 U.S. 378,
     384-87 (1987) (employee statement made only to co-worker concerning President Reagan was
     speech on a matter of public concern).

1    The Berry court did, however, rely on traditional forum analysis, rather than the

2 Pickering balancing test, to resolve the constitutional issues associated with the use of work

3 site premises for prayer meetings applying, *inter alia*, Cornelius, 473 U.S. 788. The public

4 employer's rules "did not prohibit its employees from holding prayer meetings in the common

5 break room or outside," but closed a certain conference room "to employee social or

6 religious meetings such as might convert the conference room into a public forum."[9] Berry,

7 447 F.3d at 657, 653 (finding from an analysis of the uses of the conference room it "remains

8 a non-public forum," because "the only permitted use of the room that was not generally

9 associated with the Department's administrative duties was for birthday parties and baby

10 showers"). Berry concluded, applying forum analysis standards, those restrictions on the

11 civil rights of its employees to exercise their religion using a government facility with

12 circumscribed permitted uses "were reasonable, and the Department's reasons for imposing

13 them outweigh any resulting curtailment of Mr. Berry's rights under the First Amendment of

14 the United States Constitution . . . ."[10] Id.

15    The AP 4.6 provisions at issue in this case, on their face, apply equally to employees

16 and to any other person or entity requesting to use any area of court facilities not engaged

17 for official court business, using a formal reservation process. This is therefore not a case

18 _____

19    [9]   The agency Director told Mr. Berry he could not use the conference room for prayer

20 meetings. Mr. Berry nevertheless continued to conduct the prayer meetings, without officially scheduling them. The Director sent him a letter reiterating that the prayer meetings could not be held in the conference room, asserting a prohibition directed to *any and all* uses of the non-public portion

21 of the building "for purposes other than that directly associated with the carrying out of our administrative duties as Social Services," because any other use "opens the non-public portions of

22 the building to ANY and ALL groups that wish to request usage thereof," and the Director stated he was unwilling to create a situation where he had to grant permission whenever requested "regardless

23 of the purpose or motivation of said group." Berry, 447 F.3d at 647 n. 1. "Whether it be your intention or not, using a County conference room for public purposes (i.e. non County related)

24 transforms it into a public forum that can be used by any group of any persuasion, whether or not they are employed by the County." Id. He instructed Mr. Berry on that basis "you may not use these

25 facilities for the purpose of praying as an organized or informal group." Id.

26    [10]   "[W]e conclude that the Department has successfully navigated between the Scylla of not respecting its employee's right to the free exercise of his religion and the Charybdis of violating the

27 Establishment Clause of the First Amendment by appearing to endorse religion. Specifically, **we hold that the public employer's interests in avoiding violations of the Establishment Clause**

28 **and in maintaining the conference room as a *nonpublic forum* outweigh the resulting limitations on Mr. Berry's free exercise of his religion at work**." Berry, 447 F.3d at 646 (emphasis added).

where employees are singled out for more restrictive treatment or where the court administration is attempting to "regulate its employee's conduct to ensure the effective performance of its operations" in an attempt by the court administration to preserve the state employer's interest in the efficient performance of its public services. <u>Waters</u>, 511 U.S. at 668 (citation omitted).  The policy expressly applies not only to Superior Court employee requests, but also to requests from "government or outside agencies, or by the public to use courthouse meeting rooms, unassigned courtrooms, offices or other public or non-public areas of any court facility. . . ." AP 4.6.II.C.  Accordingly, the court is persuaded forum analysis rather than the <u>Pickering</u> test balancing the interests of an employee against the interests of a public employer provides the proper standards to address this dispute.[11]

### C.   Forum Characterization And Constitutional Review Standards

#### 1.   Options & Consequences

The challenged policy applies to "court facilities," identified as "courthouse meeting rooms, unassigned courtrooms, offices or other public or non-public areas of any court facility." AP 4.6.II.C.1.  The only areas of the courthouse Plaintiffs seek to use are locations where they allegedly held Bible study sessions in the past (*i.e.*, jury rooms from 2000 to 2006) or have attempted to obtain permission to use (*i.e.*, individual courtrooms not in use for court business).  The parties do not agree on the appropriate characterization of those premises for forum analysis purposes.

The first step in assessing First Amendment claims related to speech restrictions on government property is to "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." <u>Sammartino v. First Judicial District Court, County of Carson City</u>, 303 F.3d 959, 965 (9th Cir. 2002) *quoting* <u>Cornelius</u>, 473 U.S. at 797 (forum analysis begins by "identify[ing] the nature of the forum" and "whether the forum [at issue] is public or non-public"); *see* <u>DiLoreto v.</u>

---

[11]   That decision is further supported by the fact AP 4.6.II.C expressly pertains to use of courthouse areas not only by court employees, but also by other government agencies "and the public."  Accordingly, the Court cannot assume the other types of meetings Plaintiffs allude to in making their religious and speech discrimination arguments relate only to uses by other employees.

Downey Unified Sch, Dist. Bd. of Educ., 196 F,3d 958, 964 (9th Cir. 1999) ("forum analysis has traditionally divided government property into three categories: public fora, designated public fora, and nonpublic fora"); *see also* Hopper v. City of Pasco, 241 F.3d 1067, 1074 (9th Cir. 2001) ("[T]he two main categories of fora are public (where strict scrutiny applies) and non-public (where a more lenient 'reasonableness' standard governs)," with government property further divided for forum analysis purposes "into three categories:  [traditional] public fora, designated public fora, and nonpublic fora"), *quoting* DiLoreto, 196 F.3d at 964.

In characterizing a forum, courts consider "the selectivity with which the forum was open to particular forms of expression."   Hooper, 241 F.3d at 1078, *citing*  Arkansas Educ. Television Com'n v. Forbes, 523 U.S. 666, 679 (1998).   "[T]he more restrictive the criteria for admission and the more administrative control over access, the less likely a forum will be deemed public."  Id.   Another factor courts consider is "whether the expressive activity is consistent with the principal function of the forum," an inquiry that "focuses on the specific space to which the would-be speaker seeks access" . . .  tak[ing] into account the context of the property as a whole." Id., *citing* Cornelius, 473 U.S. at 804, DiLoreto, 196 F.3d at 968.

The government's intent informs the characterization of what type of forum has been established. Courts examine the terms on which the forum operates to determine whether it is a traditional or designated public forum or whether it is a nonpublic or limited public forum.  See  Hopper, 241 F.3d at 1074.

> "The government, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated." [United States v.] Grace, 461 U.S. [171,] 178 [(1983)]. . . "**It is the 'location and purpose' of the property and the government's subjective intent in having the property built and maintained, that is crucial to determining the  nature of the property for forum analysis**." Jacobsen [v. Bonine]. 123 F.3d [1272,] 1274 [9th Cir. 1997].[[12]]

---

[12]    The Sammartino court continued its analysis of those premises:  "The Complex in this case was built, and is operated for the purpose of conducting the business of the county and of the municipal and state courts.[] It is not, like a public street or park, the kind of public property that has 'by long tradition or by governmental fiat . . . been devoted to assembly and debate.' [Citation omitted.] There is no suggestion that the Complex has been 'opened for use by the public as a place for expressive activity,' . . . such that it could be considered a 'designated public forum,' or that it has been intentionally opened for expression by certain groups or on certain topics, such that it could be considered a 'limited public forum.'  *See* Hopper, 241 F.3d at 1074-75." Sammartino, 303 F.3d at

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

_Sammartino_, 303 F.3d at 966, 972 (emphasis added);[13] _see also_ _Forbes_, 523 U.S. at 679-80 (discussing the effect of selective access on forum analysis in reliance _inter alia_ on _Cornelius_, _Widmer_, and _Perry_ to conclude: "These cases illustrate the distinction between 'general access' . . . which indicates the property is a designated public forum, and 'selective access,' . . . which indicates the property is a non-public forum") (citations omitted).[14]

Once the nature of the forum is identified, courts determine whether the challenged speech restrictions are justified under the corresponding constitutional standard. _Cornelius_, 473 U.S. at 797. At one end of the spectrum, speakers can be excluded from a public forum only when necessary to serve a compelling state interest and when the exclusion is narrowly drawn to achieve that interest. _Perry Educ. Ass'n v. Perry Local Educators' Ass'n_, 460 U.S. 37, 45 (1983). At the other end, the government is subject to the least amount of scrutiny

966. "However, we emphasize again that permissible regulation within the courtrooms, and with respect to particular cases or circumstances, is not at issue in this case, and that our holding in this case is directed only at the policies and Rules that generally regulate behavior in the non-courtroom areas of the Complex." _Id._ at 975 (rejecting, for lack of a factual showing on the record then before the court at the preliminary injunction stage, defendants' argument in support of the need for the Rules as then written that the "public interest in a safe, dignified and fair environment in which to resolve disputes" constituted a competing interest to plaintiffs' First Amendment rights adequate to justify denial of injunctive relief, for lack of any showing "the regulation of biker clothing in hallways and other non-courtroom areas of the Complex can plausibly be justified by the need to protect the courtroom environment itself").

[13]    The _Sammartino_ court, deciding a 42 U.S.C. § 1983 challenge brought by plaintiffs who were denied entrance to portions of the county courthouse after refusing to remove clothing bearing symbols of motorcycle organizations, found the facilities were a nonpublic forum. That court further found the rules at issue were "aimed squarely at expressive conduct" because they "specifically limit[ed] the 'words,' 'pictures,' 'symbols' and 'markings' that people may wear within the building." The court held those defendants, in implementing the challenged rules, appeared from the record presented to be impermissibly "motivated by the nature of the message rather than the limitations of the forum or a specific risk within that forum," applying the two-part _Cornelius_ test for determining the constitutionality of limitations on speech in a nonpublic forum: "Restrictions on free expression in a nonpublic forum are constitutional only if the distinctions drawn (1) are 'reasonable in light of the purpose served by the forum' and (2) are viewpoint neutral.'" _Sammartino_, 303 F.3d at 966, 972, _quoting_ _Cornelius_, 473 U.S. at 806.

[14]    "The _Cornelius_ distinction between general and selective access furthers First Amendment interests. By recognizing the distinction, we encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all. That this distinction turns on governmental intent does not render it unprotective of speech. Rather, it reflects the reality that, with the exception of traditional public fora, the government retains the choice of whether to designate its property as a forum for specified classes of speakers." _Forbes_, 523 U.S. at 680.

in its access decisions related to nonpublic fora, violating the First Amendment only "when it denies access. . . to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." Cornelius, 473 U.S. at 806.   That distinction is not determinable from the simple fact the government has opened a nonpublic forum to expressive activity. Courts must examine the government's restriction for *viewpoint neutrality* and *reasonableness* in light of the purpose served by the forum. DiLoreto, 196 F.3d at 965.[15] "The reasonableness analysis emphasizes the consistency of the limitation in the context of the forum's intended purpose." Cogswell v. City of Seattle, 347 F.3d 809, 817 (9th Cir. 2003), *citing* DiLoreto, 196 F.3d at 967-68 ("reasonableness analysis focuses on whether the limitation is consistent with preserving the property for the purpose to which it is dedicated").   The nature and function of the location as a whole is relevant to consideration of the reasonableness of governmental exclusions. See Good News Club v. Milford Central School, 533 U.S. 98, 139 (2001) (the government can exclude certain **subject matter or activities** it deems inconsistent with the forum's purpose, so long as the it does not discriminate against a speaker's **viewpoint**).

The government is free to restrict access to a non-public forum, as long as the restrictions are reasonable, and are not an effort to suppress expression merely because public officials oppose a speaker's viewpoint. Cornelius, 473 U.S. at 806 ("Although a speaker may be excluded from a non-public forum if he wishes to address a topic not encompassed within the purpose of the forum . . . or if he is not a member of the class of speakers for whose especial benefit the forum was created . . ., the government violates the First Amendment when it denies access to a speaker solely to suppress the *point of view* he

---

[15]   The DiLoreto court rejected plaintiffs' free speech challenge to a school district's policy to screen potential advertisements before approving them to be posted on a baseball field fence, and to the district's refusal to post a Ten Commandments advertisement on grounds allowing the sign "would be viewed as a promulgation of certain religious views," and would foster excessive entanglement with religion due to the school's exposure to "the possibility of protests, other religious factions seeking equal space, and the possibility of lawsuits." DiLoreto, 74 Cal.App.4th at 277. While useful to an understanding of First Amendment principles, the Court finds the DiLoreto facts to be too dissimilar from those presented in this case to support the Rule 12(b)(6) dismissal urged by Defendants.  Moreover, reliance on cases deciding issues under summary judgment standards presumes a factual record not developed here nor properly considered in this proceeding.

espouses on an otherwise includible subject"); *see* <u>Cogswell</u>, 347 F.3d at 814 ("Under this reasonableness test, the State can restrict access to a limited public forum as long as (1) the restriction does not discriminate according to the viewpoint of the speaker, and (2) the restriction is reasonable"), *citing* <u>Perry</u>, 460 U.S. at 46; *see also* <u>Good News Club</u>, 533 U.S. at 106-07 (holding the University of Virginia's denial of funding to a student newspaper because of its Christian editorial viewpoints, where the school funded other editorial viewpoints, was impermissibly viewpoint discriminatory); *see also* <u>Rosenberger</u>, 515 U.S. at 828-29 ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," but may permissibly target subject matter).

"The principle that has emerged from our cases 'is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.' " <u>Lamb's Chapel v. Center Moriches Union Free School Dist.</u>, 508 U.S. 384, 394 (1993) (citation omitted). "To discriminate 'against a particular point of view . . . would . . . flunk the test . . . [of] <u>Cornelius</u>, provided that the defendants have no defense based on the establishment clause.'" <u>Id.</u>, *quoting* <u>May v. Evansville-Vanderburgh School Corp.</u>, 787 F.2d 1105, 1114 (7th Cir. 1986).

> The issue of the restriction's viewpoint neutrality therefore turns on the nature of the forum in relation to the subject matter limitation – if the speech at issue does not fall within an acceptable subject matter otherwise included in the forum, the State may legitimately exclude it from the forum it has created. However, if the speech does fall within an acceptable subject matter otherwise included in the forum, the State may not legitimately exclude it from the forum based on the viewpoint of the speaker.

<u>Cogswell</u>, 347 F.3d at 815, 816-17 (holding the restriction prohibiting candidate criticism of an opponent in the limited public forum of the voter's guide "acceptably limits the subject matter of the forum to candidate self-discussion," and plaintiff's submission "discussed matters outside the scope of the limited public forum and, therefore, could properly be rejected," as well as finding the governmental restriction reasonable "in light of the purpose of the forum and all of the surrounding circumstances"), *citing* <u>Perry</u>, 460 U.S. at 46, *and quoting* <u>Cornelius</u>, 473 U.S. at 789.

1    Although the "coherence of the distinction between 'content discrimination' and

2    'viewpoint discrimination' is tenuous," content discrimination occurs when the government

3    chooses the subject matter that may be discussed, while viewpoint discrimination is directed

4    to specific positions taken on the matter.  Giebel v. Sylvester, 244 F.3d 1182, 1188, 1188

5    n.10 (9th Cir. 2001) (recognizing that "the level at which 'subject matter' is defined can

6    control whether discrimination is held to be on the basis of content or viewpoint"); see Good

7    News Club, 533 U.S. at 108.[16]

8                              **a.    Traditional Public Forum**

9        The courthouse is intended for the conduct of official judicial business, not for

10   traditional public discourse.  The parties concur the San Diego County Superior Court

11   facilities, like most judicial and municipal complexes, are not a "traditional public forum," and

12   the Court agrees.  Accordingly, traditional public forum analytical standards do not apply.

13                             **b.    Designated Public Forum**

14       "In addition to traditional public fora, a public forum may be created by government

15   *designation of a place* or channel of communication for use by the public at large for

16   assembly and speech, for use by certain speakers, or for the discussion of certain

17   subjects."[17]  Berry, 447 F.3d at 653 n. 10, citing Perry, 460 U.S. at 45-46. A "designated

18   _____

19   [16]   In Good News Club, the Court held a school district engaged in impermissible viewpoint
     discrimination in refusing to allow a Christian children's club to offer a religious perspective on moral
20   and character development in the school forum, while opening the school facilities to wide community
     involvement for use "pertaining to the welfare of the community" by groups that promoted the moral
     and character development of children.  The Good News Club Court applied Rosenberger and
21   Lamb's Chapel to find the school district had discriminated on the basis of viewpoint by denying the
     plaintiff club the opportunity to teach moral and character development to children from a religious
22   perspective while permitting other groups to engage in such activity from other perspectives. Good
     News Club, 533 U.S. at 111 ("What matters for purposes of the Free Speech Clause is that we can
23   see no logical difference in kind between the invocation of teamwork, loyalty, or patriotism by other
     associations to provide a foundation for their lessons").  Although some "quintessentially religious"
24   speech (such as a call to prayer) may be part of a plaintiff's activities, Good News Club makes clear
     that such speech in furtherance of communicating an idea from a religious point of view cannot be
25   grounds for exclusion.  While a policy prohibiting religious worship services in a library meeting room
     can be held a permissible exclusion of a category of speech that is meant to preserve the purpose
26   behind the limited public forum, that prohibition could not be applied to bar the group from engaging
     in secular activities that expressed a religious viewpoint. See Faith Center, 480 F.3d 891.

27
     [17]   "Traditional public fora" are locations such as public streets and parks that "by long
28   tradition or by government fiat have been devoted to assembly and debate." Perry, 460 U.S. at 45.
     When the government intentionally dedicates its property to expressive conduct, it also creates a

public forum" exists for First Amendment purposes when "the government intentionally opens up a nontraditional forum for public discourse." Hopper, 241 F.3d at 1074 (reversing a grant of summary judgment in favor of the government defendant on grounds (among others) the city's policy not to accept "controversial" works by local artists for display was a criterion insufficient to have prevented City Hall from becoming a "designated public forum" once it was opened for that purpose, so that artwork could be excluded only when necessary to serve a compelling state interest), *quoting* DiLoreto, 196 F.3d at 964-65.  Requiring prior permission for access suggests a public forum has *not* been created by designation. Cornelius, 473 U.S. at 803 (holding a federal fundraising drive was not a designated public forum, emphasizing both the existence of a policy and its consistent application).

### c.   Non-Public Forum And Limited Public Forum

"[A] non-public forum by definition is not dedicated to general debate or the free exchange of ideas." Cornelius, 473 U.S. at 811.  Limited public fora are a type of non-public forum. Hopper, 241 F.3d at 1074.  "[S]ome courts and commentators refer to a 'designated public forum' as a 'limited public forum' and use the terms interchangeably." Id.  However, in the Ninth Circuit, those terms are not applied interchangeably or coextensively.  "Rather, a limited public forum is a sub-category of a designated public forum that 'refer[s] to a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics,' " but reserves access to it for only certain groups or categories of speech.[18] Hopper, 241 F.3d at 1074-75, *quoting* DiLoreto, 196 F.3d at 965, n.4 (the  "contours of the terms 'designated public forum' and 'limited public forum' have not always been clear").

---

public forum.  *See* Cornelius, 473 U.S. at 802 (such "designated pubic fora" are created when the government "intentionally opens a nontraditional forum for public discourse").  The government's ability to limit speech in a traditional or designated public form is highly circumscribed:  Content-based regulation is justified only when "necessary to serve a compelling state interest and [when] it is narrowly drawn to achieve that end."  Perry, 460 U.S. at 45 (content-neutral restrictions regulating time, place, and manner of speech are permissible as long as they are "narrowly tailored to serve a significant government interest, and [they] leave open ample alternative channels of communication").

[18]   A limited public forum is a sub-category of the designated public forum, where the government opens a nonpublic forum but reserves access to it for only certain groups or categories of speech.  *See* Hopper, 241 F.3d at 1074-75, 1076 ("consistency in application is the hallmark of any policy designed to preserve the non-public status of a forum").

07cv1926

In a limited public forum, restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible, with exclusions evaluated in the same way as under non-public forum analysis. *See* Rosenberger, 515 U.S. at 829; Lambs Chapel, 508 U.S. at 392-93.  "In a limited public forum, a lenient reasonableness standard applies to determine the validity of government regulations" when assailed by free speech challenges. Cogswell, 347 F.3d at 814, *citing* Cornelius, 473 U.S. at 797; Perry, 460 U.S. at 46 (1983); Hopper, 241 F.3d at 1074.  "In order to preserve the limits of a limited public forum . . . the State may legitimately exclude speech based on subject matter where the subject matter is outside the designated scope of the forum." Cogswell, 347 F.3d at 815, *citing* Good News Club, 533 U.S. at 109; Rosenberger, 515 U.S. at 829-39 ("The necessities of confining a [limited public] forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics"); *see also* Lamb's Chapel, 508 U.S. at 394; Cornelius, 473 U.S. at 806.  Expressive activity in a limited public forum accordingly may be restricted without violating the Constitution as long as the restrictions are viewpoint neutral and reasonable in light of the purpose served by the forum.

"To determine if a restriction on speech in a limited public forum is viewpoint discriminatory, we apply the guidelines established by the Lamb's Chapel line of cases." Cogswell, 347 F.3d at 815, *citing* Good News Club, 533 U.S. at 109, 107-08 (finding a public school's exclusion of a Christian club from meeting on its grounds viewpoint discriminatory because the school permitted non-religious groups "pertaining to the welfare of the community" to meet at the school); Rosenberger, 515 U.S. at 829-30; Lamb's Chapel, 508 U.S. at 394.  "[O]nce the government has chosen to permit discussion of certain subject matters, it may not then silence speakers who address those subject matters from a particular perspective." Cogswell, 347 F.3d at 815.

A policy with a broad purpose is not dispositive of an intent to create a public forum by designation. *See* Good News Club, 533 U.S. at 102.  Courts have found broadly worded policies create only limited public fora.  Opening government buildings for some purposes --

1   for example, civic meetings -- but not others -- for example, religious services -- cannot be

2   viewed as necessarily unconstitutional.  *See* Rosenberger, 515 U.S. at 829 (the government

3   is free to reserve access to a limited public forum "for certain groups or for the discussion

4   of certain topics," as long as the "rationale for the restriction" is not the "specific motivating

5   ideology or the opinion or perspective of the speaker").  Exclusion from a particular forum

6   based on content discrimination "may be permissible if it preserves the purpose of that

7   limited forum;" in contrast, viewpoint discrimination "is presumed impermissible when

8   directed against speech otherwise within the forum's limitations."  Id.

9          **D.     Parties' Forum Arguments**

10         The challenged use policy applies to "court facilities," identified as "courthouse

11  meeting rooms, unassigned courtrooms, offices or other public or non-public areas of any

12  court facility."  AP 4.6.II.C.1.  Plaintiffs contend Defendants' "prohibitions on religious

13  gatherings is a content-based restriction in a *designated public forum*."  Opp. 9:18-19

14  (emphasis added). They insist the FAC allegations, construed in the light most favorable to

15  them, establish "when the Superior Court opened the court facilities to the public [for

16  meetings], it made said facilities a designated public forum."  Opp. 10:21-27 ("Defendants

17  have allowed other organizations to meet or hold non-court related events within court

18  facilities" and "Defendants have allowed members of the public, as well as employees, to

19  participate and hold events within the court facilities"), *quoting* FAC ¶¶ 34-35.  Defendants

20  dispute that characterization, insisting the courthouse facilities are a *non-public* forum.

21         For purposes of deciding this motion,  the Court accepts as true the FAC allegations

22  "other organizations and groups, including the Boy Scouts of America and Weight Watchers,

23  were allowed to use the facilities during all times relevant to this action."  Mot. 11:18-20,

24  *citing* FAC ¶¶ 32-35.  The Court also concurs "[d]iscovery is necessary in order to determine

25  *whether* these organizations and groups were required to obtain permission [to use the

26  facilities] after the development of AP 4.6."  Mot. 11:20-22 (emphasis added).  As discussed

27  in the next section, the Court finds an evidentiary record is also essential to ascertain *how*

28  the policy has been applied, including with what consistency.  Similarly, the absence of an

1   evidentiary record regarding other uses by employees, other agencies, and the public
2   permitted by the court administration also prevents Rule 12(b)(6) dismissal of Plaintiffs'
3   Equal Protection or Establishment Clause claims.

4              **E.      The Absence Of An Evidentiary Record Prevents Forum Characterization**

5          Plaintiffs argue the courthouse facilities are a "designated public forum," subjecting
6   the AP 4.6.II.C restrictions to strict scrutiny.  If the facilities are so classified, "we must decide
7   whether the [government's] decision to exclude plaintiffs' [speech] was justified by a
8   compelling interest."  Hopper, 241 F.3d at 1075. Defendants argue the courthouse facilities
9   are a "nonpublic forum" subjecting AP 4.6.II.C to the lower reasonableness standard for
10  review of those restrictions.  If the facilities are classified as a limited public forum, "we need
11  only decide whether the exclusion was reasonable and viewpoint-neutral."  Id.

12         As discussed above, "[W]e must examine the terms on which the forum operates to
13  determine whether it is a designated public forum or a limited public forum."  Hopper, 241
14  F.3d at 1075.   "Accordingly, the Court has looked to the policy and practice of the
15  government to ascertain whether it intended to designate a place not traditionally open to
16  assembly and debate as a public forum," as well as examining "the nature of the property
17  and its compatibility with expressive activity to discern the government's intent."  Cornelius,
18  473 U.S. at 802 (government intent is the essential question in determining whether a
19  designated public forum has been established, and how a "policy and practice" is
20  implemented).

21              The "policy" and "practice" inquiries are intimately linked
            in the sense that an abstract policy statement purporting to
22          restrict access to a forum is not enough.  **What matters is what
            the government actually does** – specifically, whether it
23          consistently enforces the restrictions o use of the forum that it
            adopted.  Thus, in Cornelius, where the Court held that a federal
24          fundraising drive was not a designated public forum, the Court
            emphasized both the existence of a policy and its consistent
25          application.

26  Hopper, 241 F.3d at 1075 (emphasis added); see Cornelius, 473 U.S. at 804-05 ("The Civil
27  Service Commission . . . developed extensive admission criteria to limit access to the
28  Campaign to those organizations considered appropriate," and "[s]uch selective access,

unsupported by evidence of a purposeful designation for public use, does not create a public forum"); *see also* <u>Children of the Rosary v. City of Phoenix</u>, 154 F.3d 972, 976-77 (9th Cir. 1998) (classifying advertising panels on buses under forum analysis as a nonpublic forum, then ascertaining the relevant level of scrutiny applicable to that forum as "reasonableness" in consideration of the city's ban on non-commercial advertising on municipal buses, then determining the city properly applied the standard without viewpoint discrimination, upholding the exclusion of a religious anti-abortion ad: "a review of the city's standards and practices indicates that the city has not opened a public forum [for ads on its bus panels]" because the "city has consistently restricted political and religious advertising"); *cf., e.g.,* <u>Widmer</u>, 454 U.S. at 267 (finding a clear intent to create public forum where state university had an explicit policy of making meeting facilities available to registered student groups, illustrating the converse interpretation, *i.e.*, an explicit policy *opening* a forum suited to expressive activity is often taken at face value) *cited for that proposition in* <u>Hopper</u>, 241 F.3d at 1076, n.9.

> Thus, consistency in application is the hallmark of any policy designed to preserve the non-public status of a forum. A policy purporting to keep a forum closed (or open to expression only on certain subjects) is not a policy at all for purposes of public forum analysis ***if, in practice***, it is not enforced or if exceptions are haphazardly permitted.

<u>Hopper</u>, 241 F.3d at 1076 (emphasis added), *citing* <u>Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5</u>, 941 F.2d 45, 47 (1st Cir. 1991) (in public forum analysis, "actual practice speaks louder than words"); *see* <u>Hopper</u>, 241 F.3d at 1077 ("Therefore, the government's stated policy, without more, is not dispositive with respect to the government's intent in a given forum" (citations omitted).

The different procedural posture of <u>Berry</u> (where the court was reviewing cross-motions for summary judgment) distinguishes it from this case, where the Court must presently decide only whether the FAC states a claim upon which relief can be granted. The evidence before the <u>Berry</u> court permitted the determination the conference room remained a nonpublic forum for purposes of First Amendment analysis, and enabled it to demonstrate the plaintiff was denied use of the conference room "because he sought to use it for a

nonbusiness-related activity, and not because that activity happened to be religious."[19] <u>Berry.</u> 447 F.3d at 654.  AP 4.6.II.C, in contrast, appears to open the courthouse facilities at issue here for discretionary use, upon approval by the court administration, for purposes other than business use and employee milestone celebrations, distinguishing the forum from the <u>Berry</u> conference room.  Inasmuch as the FAC alleges the court has permitted other groups to use the courthouse facilities for other purposes, the Court must take that allegation as true for purposes of Rule 12(b)(6) analysis, and no record is presently before the Court that would permit evaluation of the manner in which court administrators have exercised their discretion.  The Court cannot characterize the forum at this time, and therefore cannot identify the proper legal standard against which to measure the challenged first amendment restrictions, precluding Rule 12(b)(6) dismissal.

### F.   The Challenged Policy Is Not Facially Unconstitutional

#### 1.   Text

The text of AP 4.6.II.C, in contrast to the restrictions under review in <u>Sammartino</u> and <u>Tucker,</u> does not permit the inference from its face that in implementing the policy Defendants were motivated by the nature of the message rather than the limitations of the forum or a specific risk within the forum.  The policy does not expressly exclude any specific subject matters or viewpoints or particular expressive activity from the courthouse facilities. As such, the text of the policy at issue in this case is distinguishable from those in the cases discussed above, and the Court therefore rejects the argument the policy is facially invalid because it restricts free speech or free expression.

\\

---

[19]  "There is no evidence of the County ever having allowed any religious or political group to meet in the space or announcing its intention to allow such a meeting.  Indeed, there is no evidence that the room has been made publicly accessible at all.  Thus, the conference room falls into that category of public property which is 'not intended to be a forum for the public expression of ideas and opinions.' "  <u>Berry,</u> 447 F.3d at 652. Although the <u>Berry</u>  court had evidence a social organization was permitted to use the conference room once, the evidence also showed the agency director then determined the group "was a nonbusiness related group and stopped the group from using the room, *just as he did with Mr. Berry*," so that the only permitted use of the conference room supported by the record that was "not generally associated with the Department's administrative duties was for birthday parties and baby showers." <u>Id.</u> at 653 (emphasis added).

### 2.    Discretion To Approve Or Deny Use Applications

Plaintiffs also object to AP 4.6.II.C because it purportedly grants unfettered discretion to the Assistant Executive Officer to grant or deny requests to use the public or non-public areas of any court facility.  They argue the listed "factors" are insufficient to protect them from impermissible viewpoint-based discrimination. The Court finds the policy text "fetters" discretion adequately to survive a facial challenge by categorizing the *kinds* of limitations the Assistant Executive Officer may permissibly consider (*i.e.*, prohibitions imposed by "constitutional, statutory, or other legal requirements").  No record is before the Court – other than the FAC allegations that during relevant time periods other groups have been permitted access to the forum whereas plaintiffs have been denied – as to what "distinctions" the decision-maker implementing AP 4.6 actually applies in granting or denying requests to use the facilities.  The Court is therefore unable to conclude AP 4.6.II.C is unconstitutional on its face under either theory Plaintiffs advance in support of that argument.

### G.    "As Applied" Discrimination Analysis Requires A Factual Record Not Before The Court And Evidentiary Considerations Impermissible Under Rule 12(b)(6) Dismissal Criteria

Courts examine policies with subjective or overly general criteria, as Plaintiffs here characterize AP 4.6.II.C, for arbitrary or viewpoint discrimination in implementation.  Applying Rule 12(b)(6) standards, the Court is unable to assess whether or how the access restriction factors enumerated in AP 4.6.II.C have been applied to permit or exclude uses of court premises, and whether the policy application discriminates on the basis of content or viewpoint.  That distinction "is not a precise one" (Rosenberger, 515 U.S. at 831),  and this is not the proceeding in which to resolve that question.  In addition, absent a factual record, it is impossible to determine whether there is any basis for the Assistant Executive Officer's assertion permitting Plaintiffs' use would expose the court to liability.  FAC Exh. D.  "[T]he mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense" or of a certain type.  Sammartino, 303 F.3d at 969, *quoting* Cohen v. California, 403 U.S. 15, 21 (1971) (characterized in that opinion as "stand[ing] for the proposition that even in light of the purposes of the forum, it is

1    not reasonable to prohibit speech in courthouse hallways merely because it may offend
2    come people's sense of decorum").

3        **H.    Defendants' Motion Is Granted In Part And Denied In Part**

4            **1.    First Cause of Action**

5        Plaintiffs' First Cause of Action alleges AP 4.6 and Defendants' enforcement of that
6    policy violate their First Amendment rights.  As discussed above, the Court finds forum
7    analysis applies to the issues presented in these circumstances, rather than the <u>Pickering</u>
8    balancing test.  Having rejected the <u>Pickering</u> balancing test, the Court must also reject
9    Defendants' arguments that Plaintiffs must show their interest in the speech at issue
10   outweighs the government's need, as an employer, to regulate that speech.  Mot. 1:20-2:2.
11   In addition, absent a factual record, the Court is unable definitively to characterize the forum
12   for purposes of identifying the appropriate legal standard to apply.  Accordingly, Defendants'
13   Rule 12(b)(6) Motion To Dismiss the First Cause of Action is **<u>DENIED</u>**.

14           **2.    Second Cause of Action**

15       Plaintiffs assert AP 4.6 is not facially neutral nor generally applicable with respect to
16   religion, in violation of the Free Exercise Clause of the First Amendment to the federal
17   Constitution.  FAC 8:18-23.  The Court rejects Plaintiffs' argument the policy is not facially
18   neutral, but **<u>DENIES</u>** Rule 12(b)(6) dismissal on the general applicability ground, for the
19   reasons discussed above.

20           **3.    Third Cause of Action**

21       Plaintiffs assert Defendants have allowed other groups and organizations to meet and
22   hold events in court facilities "generally available to the public and court employees" while
23   prohibiting Plaintiffs' Bible study in those same facilities.  Plaintiffs thus characterize
24   Defendants' enforcement of AP 4.6 as a violation of the Fourteenth Amendment Equal
25   Protection Clause because it allegedly "treats the Church disparately when compared to
26   other similarly-situated non-religious entities," without any "rational or compelling reason that
27   would justify their policy prohibiting the Bible study and its participants from accessing court
28   facilities . . . solely on the basis of the religious beliefs, speech, and conduct of the Bible

1  study and its participants."  FAC 9:9-22.  The Court must accept as true the factual
2  allegations of the complaint for purposes of Rule 12(b)(6) review.  Without expressing any
3  opinion on the merits, the Court cannot find Plaintiffs could prove no set of facts entitling
4  them to relief based on the administration's actual processing of requests to use the court
5  facilities and whether any Equal Protection issue is implicated.  The Motion is accordingly
6  **DENIED** with respect to this claim.

7            **4.    Fourth Cause of Action**

8        Plaintiff's Opposition states they voluntarily withdraw their claim AP 4.6 and its
9  enforcement violate their Fourteenth Amendment Due Process rights, but they seek to
10  preserve leave to amend in the future.  Accordingly, the Motion is **GRANTED** with respect
11  to the Fourth Cause of Action, and that claim is **DISMISSED**, without prejudice.

12            **5.    Fifth Cause of Action**

13        Plaintiffs allege Defendants "violate the Establishment Clause of the First Amendment
14  to the United States Constitution" contending "AP 4.6 and the Defendants' enforcement
15  thereof are hostile toward religion and favors [*sic*] irreligion over religion," the policy and the
16  Defendants allegedly "treat the Bible study and its participants as second-class citizens of
17  the community because of their protected religious expressions, beliefs, and conduct," and
18  Defendants deny "equal access  to an important government benefit in the form of access
19  to this forum," purportedly conveying "a governmental message that the Bible study and its
20  members are outsiders and not full members of the community" (FAC ¶¶ 59-62).

21        The Establishment Clause's two distinct guarantees are: "the government shall make
22  no law respecting the establishment of religion or prohibiting the free exercise thereof – both
23  with the common purpose of securing religious liberty." Lee v. Weisman, 505 U.S. 577, 605
24  (1992) (including clergy who offer prayers as part of a public school graduation ceremony
25  held to be forbidden by the Establishment Clause, because the public official's decision that
26  prayers should be given and his selection of the religious participant are choices attributable

27
28

1   to the state), *quoting* <u>Lynch v. Donnelly</u>, 465 U.S. 668, 678 (1984).[20]  "[T]he Establishment

2   Clause forbids not only state practices that 'aid one religion . . . or prefer one religion over

3   another,' but also those that 'aid all religions.' "  <u>Id.</u> at 609-10, Souter, J. concurring, *quoting*

4   <u>Everson v. Board of Ed. of Ewing</u> , 330 U.S. 1,  15 (1947).  "[T]he Court has unambiguously

5   concluded that the individual freedom of conscience protected by the First Amendment

6   embraces the right to select any religious faith or none at all."  <u>Wallace v. Jaffree</u>, 472 U.S.

7   38, 52-53, 61 (1985) (striking down a state law requiring a moment of silence in public

8   classrooms, not because the statute coerced students to participate in prayer (it did not do

9   so), but because the manner of its enactment "convey[ed] a message of state approval of

10   prayer activities in the public schools").

11       The issue presented here involves no coercive participation in a religious exercise.

12   Rather, the court's use of premises policy is challenged as unconstitutional as applied to

13   exclude Plaintiffs' faith-based meetings.  Although the state must accommodate its citizens'

14   religious beliefs and practices under the Constitution's free exercise and free speech

15   principles, those principles "do[] not supersede the fundamental limitations imposed by the

16   Establishment Clause, which guarantees at a minimum that a government may not . . . act

17   in a way which 'establishes a [state] religion or religious faith, or tends to do so.' "  <u>Lee</u>, 505

18   U.S. at 587.    The <u>Lee</u> Court outlines the "touchstone of Establishment Clause

19   jurisprudence:"

20           Neither a State nor the Federal Government can pass laws
            which aid one religion, aid all religions, or prefer one religion
21

22   _____

   [20]   "The First Amendment protects speech and religion by quite different mechanisms.
23   Speech is protected by ensuring its full expression even when the government participates, for the
   very object of some of our most important speech is to persuade the government to adopt an idea
24   as its own. . . . The method for protecting freedom of worship and freedom of conscience in religious
   matters is quite the reverse. In religious debate or expression the government is not a prime
25   participant, for the Framers deemed religious establishment antithetical to the freedom of all. The
   Free Exercise Clause embraces a freedom of conscience and worship that has close parallels in the
26   speech provisions of the First Amendment, but the Establishment Clause is a specific prohibition on
   forms of state intervention in religious affairs with no precise counterpart in the speech provisions.
27   . . . The explanation lies in the lesson of history that was and is the inspiration for the Establishment
   Clause, the lesson that in the hands of government what might begin as a tolerant expression of
28   religious views may end in a policy to indoctrinate and coerce.  A state-created orthodoxy puts at
   grave risk that freedom of belief and conscience which are the sole assurance that religious faith is
   real, not imposed."  <u>Lee</u>, 505 U.S. at 591-92 (citations omitted).

> over another. Neither a State nor the Federal Government, openly or secretly, can participate in the affairs of any religious organization and vice versa.[] "In the words of Jefferson, the clause against establishment of religion by law was intended to erect a 'wall of separation between church and State.'" . . . . "The Amendment's purpose. . . was to create a complete and permanent separation of the spheres of religious activity and civil authority by comprehensively forbidding every form of public aid or support for religion."

Lee, 505 U.S. at 600, Blackmun, J. concurring (footnote omitted), *quoting* Everson, 330 U.S. at 16, 31-32.

Nevertheless, a violation may be found if the governmental action has the " 'principal or primary effect' of advancing *or disapproving of* religion." Vasquez v. Los Angeles County,. 487 F.3d 1246, 1256 (9th Cir. 2007) (emphasis added), *quoting* Lemon v. Kurtzman, 403 U.S. 602, 612 (1971); *see* Brown v. Woodland Joint Unified Sch. Dist., 27 F.3d 1373, 1378 (9th Cir. 1994) (governmental action has the primary effect of advancing or disapproving religion if it is "sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices"). Although AP 4.6 appears on its face to be neutral toward religion, absent an evidentiary record regarding its implementation, the court is unable to conclude Plaintiffs' claim fails as a matter of law. Accordingly, the Motion is **DENIED** with respect to this claim.

### 6.   California Constitution

Plaintiff's Sixth, Seventh, and Eighth Causes of Action are predicated on alleged violations of the California Constitution. In particular, their Sixth Cause of Action alleges AP 4.6.II.C and Defendants' enforcement of the policy "discriminate against Plaintiffs' free expression of ideas, values, thoughts, viewpoints and opinions" in violation of the Article I, § 2 California State Constitution's Freedom of Speech protections. FAC 11:9-14. Their Seventh Cause of Action alleges their rights to free exercise of religion under Article I, § 4 of the California State Constitution are violated by AP 4.6 as interpreted and enforced by Defendants. They allege the Bible study participants' free exercise of religion is substantially burdened because the policy and the Defendants: single out religious groups and organizations for discriminatory treatment; condition access to court facilities on whether the

applicant intends to engage in religious speech; and discriminate against Plaintiffs "on the basis of their viewpoint on civil, moral, social, and other matters." FAC 12:9-22. Plaintiffs' Eighth Cause of Action alleges AP 4.6 is so vague and so lacking in sufficiently objective standards to circumscribe the "discretion of City officials" Defendants are allowed to "enforce the policy in an *ad hoc* and discriminatory manner," in purported violation of Plaintiffs' Due Process and Equal Protection rights protected by Article I, § 7 of the California State Constitution. FAC 13:2-9.

Neither side argues the outcome on any of the claims relying on the California Constitution should be different from the outcome on any of the claims asserting similar rights under the United States Constitution for purposes of Rule 12 (b)(6) analysis. *See. e.g.* Opp. 20:11. Accordingly, the Court does not address any distinction between the state and federal standards in deciding this Motion, and reaches the same result on the state and the federal constitutional claims. The Motion is **DENIED** with respect to the claims alleging violations of the California Constitution.

## III.   CONCLUSION AND ORDER

The Court lacks the necessary evidentiary basis to definitively characterize the forum, and therefore it cannot identify the correct legal standard to apply for purposes of determining whether Plaintiffs fail to state a claim. The absence of an evidentiary record also precludes a determination Plaintiffs' "as applied" allegations should be rejected for failure to state a claim. For all the foregoing reasons, **IT IS HEREBY ORDERED**:

1.   The Motion is **GRANTED** with respect to the Fourth Cause Of Action alleging Due Process violations, with Plaintiffs' acquiescence and without prejudice.

2.   The Motion is **DENIED** with respect to all other causes of action.

**IT IS SO ORDERED**.

DATED:  August 28, 2008

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge

- 32 -